## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA
## PHILADELPHIA DIVISION

|  |  |
|---|---|
| JEFFREY SAWYER, individually and on behalf of all others similarly situated, | Civil Action No. 5:16-cv-05674-JFL |
| Plaintiff, | |
| v. | *Electronically Filed* |
| HEALTH CARE SOLUTIONS AT HOME INC. and LINCARE INC., | |
| Defendants. | |

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S PRE-DISCOVERY MOTION FOR CONDITIONAL CERTIFICATION AND COURT-SUPERVISED NOTICE TO POTENTIAL OPT-IN PLAINTIFFS

Defendants, Health Care Solutions at Home Inc. ("HCSH") and Lincare Inc. ("Lincare") (collectively, "Defendants" or "the Company")[1] hereby file their Brief in Opposition to Plaintiff's Pre-Discovery Motion for Conditional Certification and Court-Supervised Notice to Potential Opt-In Plaintiffs Pursuant to 29 U.S.C. §216(b) (the "Motion") (Doc. 18).  As shown below, Plaintiff's Motion should be denied because he and his proposed class members are not similarly situated, and collective treatment of this action would prove unmanageable as the Court would be tasked with analyzing the validity and enforceability of the proposed class members' class and collective action waivers, which relinquished the right to join this or any other collective or class action brought against the Company.

---

[1] Lincare Inc. was not Plaintiff's employer and is not a proper party to this action. By referring to Defendants collectively for the limited purpose of opposing conditional certification, Lincare expressly preserves and does not waive its arguments that (i) Lincare never employed Plaintiff, and (ii) Plaintiff is not a proper class representative of Lincare's employees.

**TABLE OF CONTENTS**

Introduction ...........................................................................................................1

Statement of Facts...................................................................................................2

    A.    Company Background ..............................................................................2

    B.    Timekeeping Policies and Verification System ........................................4

    C.    Plaintiff's Employment At HCSH And Definition Of Proposed Class ....................6

    D.    Non-Exempt, Hourly Positions In Pennsylvania ......................................7

        1.    Service Representatives .................................................................8

        2.    Customer Service Representatives.................................................9

        3.    Health Care Specialists .................................................................9

        4.    Regional Billing & Collections Office Employees...........................9

    E.    The Proposed Class Members' Methods Of Taking And Tracking Meal Breaks Varied Widely Depending On Their Position, Geographic Location, Staff Size And Experience, And Manager ...........................................10

    F.    The Proposed Class Members Either Were Not Eligible For, Or Did Not Receive, The Same Bonuses As Plaintiff ..............................................14

Statement of the Questions Involved .....................................................................15

Summary of Argument ...........................................................................................16

Argument ...............................................................................................................17

    I.    The Standard for Conditional Certification In The Third Circuit Requires Plaintiff To Make A Modest Factual Showing, Beyond Pure Speculation, That He Is Similarly Situated To His Proposed Class Members ........................17

    II.    As A Threshold Matter, Many, If Not All, Of The Proposed Class Members Are Barred From Participating In This Action Because They Waived The Right To Bring A Class Action Or Collective Action Against The Company As A Condition Of Their Employment ...........................19

i

III.    Conditional Certification Is Inappropriate Because Plaintiff Has Not
        Demonstrated That He Is Similarly Situated To The Potential Class
        Members ....................................................................................................20

        A.      Plaintiff And His Proposed Class Members Are Not Similarly
                Situated, And Their Claims Are Not Susceptible To Common Proof.......20

        B.      This Court Should Reach the Same Decision As The Middle District
                of Florida's *Udo* Decision And Find That The Proposed Class
                Members Are Not Similarly Situated, And That The Nature of
                Defendants' Business Operations Are Not Suitable For Collective
                Treatment Of Meal Break Claims...............................................................22

        C.      The Company's Only Common Policies Are Lawful; Consequently,
                Any Manager's Deviation From The Policies Would Require
                Individualized Analysis ............................................................................24

        D.      Plaintiffs' Declarations Are Too Vague And Speculative To
                Support Conditional Certification..............................................................25

IV.     At A Minimum, If The Court Grants Conditional Certification, The Proposed
        Meal Break Class Should Be Limited To Plaintiff's Position And Geographical
        Location, And The Proposed Bonus Class Should Be Limited To Those
        Who Received The Unit Dose Bonus During The Relevant Time Period.
        Also, Notice Should Be Disseminated Only By U.S. Mail And Revised To
        Inform Opt-Ins Of The Consequences Of Joining This Lawsuit ..........................27

Conclusion ....................................................................................................................29

Proposed Order

ii

# TABLE OF AUTHORITIES

*Adami v. Cardo Windows, Inc.*
   299 F.R.D. 68, 81-82 (D.N.J. 2014)………...............……………………………….…19

*Andersen v. Wells Fargo Financial, Inc.*
   No. 4:11-cv-00085, 2012 WL 12871958, at *6 (S.D. Iowa Feb. 6, 2012)……...……….24

*Armstrong v. Weichert Realtors*
   No. 05-3120 (JAG), 2006 WL 1455781, at *1 (D.N.J. 2006)………………...……….26

*Blakes v. Ill. Bell Tel. Co.*
   No. 11CV336, 2011 WL 2446598, at *6-7 (N.D. Ill. June 15, 2011)…………………...28

*Bramble v. Wal-Mart Stores, Inc.*
   No. 09-4932, 2011 WL 1389510, *4-5 (E.D. Pa. Apr. 12, 2011)…….……......……..17-18

*Burkhart–Deal v. Citifinancial, Inc.*
   No. 07–1747, 2010 WL 457127, at *5 (W.D. Pa., Feb. 4, 2010)………………………..17

*Camesi v. University of Pittsburgh Med. Ctr.*
   729 F.3d 239, 243 (3d Cir. 2013)………………………………………….………..17

*Duffy v. Sodexho*
   No. 05-5428, 2006 WL 3025958, at *3 (E.D. Pa. Oct. 20, 2006)………………………19

*Fulton v. Bayou Well Services LLC*
   208 F. Supp. 3d 798, 803 (N.D. Tex. 2016)……………………………….……………28

*Gjurovich v. Emmanuel's Marketplace, Inc.*
   282 F. Supp. 2d 91, 98 (S.D.N.Y. 2003)…………………………………...……………29

*Hinterberger v. Catholic Health Sys.*
   No. 08–CV–380S, 2009 WL 3464134, at *11 (W.D.N.Y. Oct. 21, 2009)……….……..28

*Holley v. Erickson Living*
   No. 11-2444, 2012 WL 1835738, at *4 (E.D. Pa. 2012)………………..…….…..…28

*Joza v. WW JFK LLC*, No. 07-CV-4153 (ENV) (JO)
   2010 WL 3619551, at *7 (E.D.N.Y. Sep. 10, 2010)…………..………………….……...20

*Kronick v. Bebe Stores, Inc.*
   No. 07-4514 (RBK), 2008 WL 4546368, at *3 (D.N.J. 2008)…………………….......26

*Ruehl v. Viacom, Inc.*
    500 F.3d 375, 389 (3d Cir. 2007)……………………………………………………..28

*Smith v. Sovereign Bancorp*
    No. Civ. A. 03-2420, 2003 WL 22701017, at *2 (E.D. Pa. Nov. 13, 2003)………..…....18

*Thompson v. Speedway SuperAmerica, LLC*
    No. 08-cv-1107(PJS/RJE), 2009 WL 130069, at *13 (D. Minn. Jan. 20, 2008)…..……27

*Udo v. Lincare Inc.*
    No. 8:13-cv-1899-T-23TGW, 2014 WL 5354589, at *10-11
    (M.D. Fla Aug. 6, 2014)……………………………...…………...……….22, 23, 24

*White v. Rick Bus Co.*
    743 F. Supp. 2d 380, 389 (D.N.J. 2010)……...…………………………..........…..19

*White v. Subcontracting Concepts, Inc.*
    No. 8:08-cv-620-T-30TGW, 2008 WL 4925629, at *2 (M.D. Fla. Nov. 14, 2008)……..29

*Williams v. Securitas Sec. Servs. USA, Inc.*
    No. 10–7181, 2011 WL 4544009, at *1 (E.D. Pa. 2011)………………………………..26

*Wright v. Lehigh Valley Hosp.*
    No. 10-431, 2010 WL 3363992, at * 4 (E.D. Pa. 2010)………………….…...…26, 27

*Wright v. Lehigh Valley Hosp. & Health Network*
    No. 10-431, 2011 WL 221770, at *7 (E.D. Pa. Jan. 20, 2011)………...……….…...…29

iv

## INTRODUCTION

By requesting statewide notification of current and former employees in 15 different hourly positions across 22 locations in Pennsylvania, Plaintiff asks this Court to authorize a fishing expedition to locate hundreds of non-parties who worked for different managers, in different locations, spanning different regions, with different job duties and different meal break and bonus practices in place. Even if Plaintiff could somehow persuade the Court that he and his proposed class members are similarly situated, this action is especially unsuitable for collective treatment because any proposed class members hired since August 2012 would be prevented from joining this action or participating in any future recovery (even if they wanted to) because they signed stand-alone class and collective action waivers as a condition of their employment. Likewise, since July 2013, all employees, including Plaintiff, have acknowledged in writing and agreed to be bound by the class and collective action waiver in the Company's Employee Handbook. Thus, even if Plaintiff had standing to represent proposed class members who were hired after August 2012, which he does not, this action would be hopelessly bogged down by individualized determinations of the validity of the class members' particular waivers and their right to participate in this lawsuit.

Further, Plaintiff has not met his burden of making a modest factual showing that he and his proposed class members are similarly situated. Instead, Plaintiff offers only his own conclusory assertions and the vague generalizations of a former manager of one location to justify his sweeping request. Tellingly, although Plaintiff attempts to represent all hourly employees in the state, he does not even refer to 13 of the at least 15 different hourly positions in his declarations, nor do his declarations identify a single such person by name. In fact, none of the proposed class

members have consented to join this action, or come forward with evidence demonstrating that they, too, were affected by the alleged unlawful policies and practices of which Plaintiff complains.

Although Plaintiff may portray the standard for conditional certification in this Court as virtually non-existent, he still cannot show that his allegations should proceed collectively. There are fundamental differences between Plaintiff's claims and the potential claims of his proposed class members that make conditional certification profoundly inappropriate and unmanageable in this case. Consequently, Plaintiff's Motion should be denied in its entirety.

## STATEMENT OF FACTS

### A.    Company Background

The Company provides oxygen, respiratory, and home infusion products and services to patients who suffer from respiratory diseases and seek an improved quality of life. Among other products, the Company provides pressure cylinders of compressed oxygen, stationary and portable liquid oxygen systems, oxygen concentrators, and other oxygen-related equipment and supplies to patients in their homes and in nursing homes. Exhibit 1 ¶ 6. Between October 31, 2013, to the present (the "relevant time period"), the Company has operated at least 22 service centers in Pennsylvania, as well as two Regional Billing & Collection Offices ("RBCOs"). Exhibit 1 ¶ 8. Currently, centers are located in Altoona, Aston, Bethlehem, Butler, Erie, Hanover, Harrisburg (Camp Hill), Lancaster, Latrobe, Lewisberry, Meadville, Monroeville, New Castle, Philadelphia (Broomall), Pittsburgh, Scranton (Plains Township), Sharon Ferrell), Stroudsburg, Uniontown, Washington, Williamsport, (Montoursville), Wyomissing (Reading), and York. Exhibit 1 ¶ 8. Each center location is autonomous and locally managed and operated by a Center Manager who oversees employees at his or her respective facility. Exhibit 1 ¶¶ 10, 37. Typically, centers operate Monday through Friday from 8:00 a.m. to 5:00 p.m. All employees, including non-exempt

2

employees, are scheduled to work during the center's business hours.  Some centers, however, may open early or stay open later depending on its geographical area, available staff, and customer needs.  Exhibit 1 ¶ 11.  Each Center Manager exercises discretion to manage attendance, scheduling, timekeeping, and performance of their hourly employees.   During the relevant time period, the Company employed 34 individuals as Center Managers.  Exhibit 1 ¶ 10.

During the relevant time period, the Company also operated two Regional Billing & Collections Offices in Sharon and Latrobe, Pennsylvania. Exhibit 1 ¶ 12.  The Regional Billing & Collections Office Manager reports directly to the Regional Billing Manager.  Exhibit 1 ¶ 14; Exhibit 5 ¶ 5; Exhibit 6 ¶ 5.  There is no reporting relationship between Regional Billing & Collections Office Managers and Center Managers, who oversee centers.  Nor do Center Managers exercise any supervisory authority over Regional Billing & Collections Office employees.  Exhibit 1 ¶ 14; Exhibit 5 ¶ 5; Exhibit 6 ¶ 5.

The Human Resources functions for the Company are decentralized and handled primarily on the local level.  Although Lincare's overarching corporate policies are drafted and promulgated from the headquarters in Clearwater, Florida, most of the day-to-day human resources issues, such as scheduling and payroll, are handled at the local level.  Exhibit 1 ¶ 7.  Since August 2012, all new hires at the Company have executed stand-alone class action and collective action waivers as a condition of their employment.  Exhibit 1 ¶ 47, Attachment 9.  The waiver reads in pertinent part, "As a condition of employment to the extent permitted by law, you agree to waive any right you may have to be a lead and/or member of a Class or Collective action lawsuit or a representative of a Class or Collective action lawsuit against Lincare or any of its subsidiaries or related entities." *Id.*   In addition, since July 2013, the Company's Employee Handbook has included a class and collective action waiver.  Exhibit 1 ¶ 47, Attachment 10.  All employees, including Plaintiff,

acknowledge receipt of the Handbook in writing and agree to be bound by its terms as a condition of their continued employment.  Exhibit 1 ¶ 47, Attachment 11.

### B.        Timekeeping Policies and Verification System

The Company has adopted several company-wide policies to ensure employees do not work off-the-clock, are paid all overtime due, and are paid for all time worked (including time worked through meal breaks, when applicable).  Exhibit 1 ¶¶ 25-26.  Specifically, the policies cited below are from the Employee Handbook:

> Meal Periods/Breaks – All employees are required to take a mid-day break for a meal period of at least thirty (30) minutes during each work day, which must be recorded in the timekeeping system by all non-exempt employees . . . If you are located in a state that requires a meal period, you must actually break from work and, if you are a non-exempt employee, you must accurately record that break in the timekeeping system. If you are located in a state that does not require a meal period and you occasionally elect to work through the day without a meal period, your time sheet must reflect your actual hours worked.[2]

Exhibit 1 ¶ 25.

> Timekeeping – Non-exempt employees are responsible for accurately recording their actual hours worked in the timekeeping system, and/or having their manager make adjustments to reflect actual hours worked, including any time worked while on-call.  This includes reporting meal breaks that non-exempt employees take in the time recording system and informing one's manager if an employee elects to work through a lunch break or takes less than a 30 minute break.  Thus, both the employee and the manager are to ensure that actual hours worked are correctly recorded in the system and submitted to Payroll.[3]

Exhibit 1 ¶ 26.

---

[2] The purpose of the meal break policy is to provide employees a mental and physical break to recharge during the work day.  The need for meal breaks and personal time is even more important for Service Representatives who are out on the road all day making deliveries and driving. Exhibit 1 ¶ 25.

[3] In addition to reviewing the Timekeeping Policy in the Employee Handbook and signing a Handbook Acknowledgment, non-exempt employees also review the Timekeeping Policy as a separate training and electronically sign a Timekeeping Policy Acknowledgment which states, among other things, "I acknowledge that I have read and will follow Lincare's policies with regard to unpaid meal breaks, rest breaks and the accurate recording of all time worked."  Exhibit 1 ¶¶ 28, 29, Attachments 5 and 7.

4

Because the Company operates on a bi-weekly pay system, at least once every other week, managers review the hours their employees reported during the preceding pay period.  Exhibit 3 ¶ 24; Exhibit 4 ¶ 22; Exhibit 5 ¶ 10; Exhibit 6 ¶ 10; Exhibit 7 ¶ 23; Exhibit 8 ¶ 25; Exhibit 9 ¶ 24; Exhibit 10 ¶ 22.  At the end of each pay period, employees are required to log in to the timekeeping system to review the time entries and ensure their accuracy.  Exhibit 1 ¶ 38; Exhibit 3 ¶ 24; Exhibit 4 ¶ 22; Exhibit 5 ¶ 10; Exhibit 6 ¶ 10; Exhibit 7 ¶ 14; Exhibit 8 ¶ 25; Exhibit 9 ¶ 24; Exhibit 10 ¶ 22; Exhibit 12 ¶ 11; Exhibit 11 ¶ 13.  If any edits are needed, the employee submits a Time Card Change Request to his or her manager.  Exhibit 3 ¶ 19; Exhibit 4 ¶ 17; Exhibit 7 ¶ 21; Exhibit 8 ¶ 19.  After those edits are made by the manager, the employee must go back into the timekeeping system to confirm the accuracy of the revised time entries.  If no edits are needed, the employee clicks "approve," verifying that his or her time entries are accurate.  Exhibit 1 ¶ 38, Attachment 7.  It is only after an employee reviews and approves his or her own time that a manager does the final review and approves the employee's time for submission to payroll.  Exhibit 3 ¶ 24; Exhibit 4 ¶ 22; Exhibit 7 ¶ 23; Exhibit 8 ¶ 25; Exhibit 9 ¶ 24; Exhibit 10 ¶ 22.  If a manager makes an adjustment to an employee's time after the employee has approved it, the time entries are sent back to the employee to review and approve the adjustment.  Exhibit 1 ¶ 38.

In order to reinforce compliance with the Company's lawful pay practices, the Company periodically communicates with managers concerning their obligations under the Meal Break and Timekeeping Policies.  Exhibit 1 ¶ 27.  For instance, in May 2012, the Company had a series of telephone conferences with Area Managers in order for them to inform Center Managers of their policies regarding meal breaks.  Center Managers were instructed in pertinent part:

(a) Managers should avoid changing punches that were electronically entered by employees; (b) Time entered in the timekeeping system should match daily logs, regarding clock in and out times, including mid-day meal breaks.  Entering the same clock-out and clock-in times for mid-day meal breaks day after day is a red flag and

5

> suggests that the manager did not confirm that a meal break was actually taken; (c) all employees should be taking a mid-day meal break of at least 30 minutes, per company policy.  However, if any employee does not take a mid-day meal break, the meal break cannot be deducted from their time, as we must pay non-exempt employees for all time worked; and (d) all time worked by non-exempt employees must be paid.  If an employee works time that was not authorized in advance (*i.e.*, "works through lunch without approval"), the time worked must be paid.  The fact that the employee disregarded a policy or directive is a performance issue and should be addressed through corrective action.

"Review of Timekeeping Guidelines," Exhibit 1 ¶ 27, Attachment 3.  The Midwest Region Manager has also reminded Center Managers of their obligation to pay non-exempt employees for all hours worked, including time worked during a meal break and overtime.  Exhibit 1 ¶ 28, Attachment 4.  In addition, the Company's Human Resources department conducts training of all newly-hired and newly-promoted Center Managers.  Among other topics covered during the "CM 101" training are the Company's Meal Break and Timekeeping policies and the responsibility of each Center Manager and employee to ensure that non-exempt employees are paid for all hours worked, including time worked during meal breaks and overtime.  Exhibit 1 ¶ 28.  Thus, the only Company policies in effect during the timeframe relevant to this litigation were lawful and required that non-exempt employees accurately report and be paid for all time worked (including time worked during meal breaks and overtime).

C.    **Plaintiff's Employment At HCSH And Definition Of Proposed Class**

Plaintiff worked for HCSH at a service center located in Wyomissing, Pennsylvania, as a Service Representative from May 2003 to September 2016.  Plaintiff never worked outside of Wyomissing and never worked in a position other than Service Representative.  Exhibit 1 ¶ 24.  Plaintiff defines his proposed class as follows:

> *All current and former drivers, customer service representatives, **and other hourly employees** who worked for Health Care Solutions at Home Inc. and/or Lincare Inc. d/b/a Lincare in the Commonwealth of Pennsylvania at any time in the last 3 years.*[4]

Pl.'s Motion (Doc. 18) at 1 (emphasis added).

### D.    Non-Exempt, Hourly Positions In Pennsylvania

There are at least 15 different types of non-exempt, hourly employees who worked in Pennsylvania during the relevant time period. Centers generally employed some or all of the following positions as non-exempt, hourly employees, each with different roles and responsibilities: Service Representatives; Senior Service Representatives; Customer Service Representatives; Senior Customer Service Representatives; Customer Service Supervisors; Health Care Specialists; and Senior Health Care Specialists.  One center employed a CPAP Service Technician during the relevant time period.

The Company also operated two Regional Billing & Collections Offices in Sharon and Latrobe, Pennsylvania during the relevant time period.  Each Regional Billing & Collections Office generally employed the following positions as non-exempt, hourly employees, each with different roles and responsibilities:  Upfront Review Clerks; Senior Upfront Review Clerks; Patient Account Coordinators; A/R Clerks; A/R Group Leaders; Cash Application Clerks; and Cash Application Group Leaders.

In total, during the relevant time period, the Company employed at least 412 employees in at least 15 distinct non-exempt, hourly positions.  Approximately 30 percent of the Company's non-exempt employees worked in Regional Billing & Collections Offices, NOT service centers

---

[4] In his Brief, Plaintiff seems to flip flop back and forth between inferring that his proposed class is limited to Service Representatives and Customer Service Representatives, and then claiming generally that he seeks to represent all other current and former hourly employees, without offering an iota of evidence concerning those other positions.  *See*, e.g., Pl.'s Brief (Doc. 19) at 3-4 (where Plaintiff refers to the putative class as Service Representatives and Customer Service Representatives); at 13 (where Plaintiff claims that "hourly-paid employees" in York, Hanover, and Harrisburg" complained about auto-deductions of lunch breaks); and at 15 (where Plaintiff asks the Court to authorize notice to all hourly employees).

like the Plaintiff:

**Job Title**

| | |
|---|---|
| A/R Clerk | 5 |
| A/R Group Leader | 4 |
| Cash Application Clerk | 34 |
| Cash Application Group Leader | 2 |
| Customer Service Representative | 84 |
| Customer Service Representative, Senior | 5 |
| Customer Service Supervisor | 2 |
| File Clerk | 2 |
| Group Leader | 1 |
| Healthcare Specialist | 62 |
| Payroll Specialist | 2 |
| Patient Account Coordinator | 65 |
| Service Representative | 103 |
| Service Representative, Senior | 24 |
| Service Technician-CPAP | 1 |
| Upfront Review Clerk | 16 |
| **Total** | **412** |

Other than being classified as non-exempt, these positions had their own distinct duties, responsibilities, management, and work environments. Exhibit 1 ¶ 16, Attachment 1. Indeed, even within the service centers, the various types of non-exempt, hourly positions differ greatly from one another depending on job duties, time spent in the office versus on the road, meal break practices, geographic location, and Center Manager. Exhibit 1 ¶16; Exhibit 3 ¶ 3; Exhibit 4 ¶ 3; Exhibit 5 ¶ 7; Exhibit 6 ¶ 7; Exhibit 7 ¶ 7; Exhibit 8 ¶ 3; Exhibit 9 ¶ 3; Exhibit 10 ¶ 3; Exhibit 12 ¶ 3; Exhibit 11 ¶ 3. The majority of hourly employees who work in service centers occupy the positions of Service Representative, Customer Service Representative, or Health Care Specialist.

1. *Service Representatives*

Service Representatives are drivers who are responsible for making deliveries and completing related documentation, scheduling deliveries with patients, delivering and/or picking

8

up equipment, cleaning equipment, shipping broken equipment out for repair or for warranty service, retiring old equipment, and cleaning the warehouse.  Because Service Representatives spend most of their time away from their respective centers during the day, they decide on an individual, day-by-day basis, when and where to take meal breaks.  Exhibit 1 ¶ 17; Exhibit 3 ¶ 6; Exhibit 4 ¶ 6; Exhibit 8 ¶ 6; Exhibit 7 ¶ 8; Exhibit 9 ¶ 6; Exhibit 10 ¶ 6.

### 2. *Customer Service Representatives*

Customer Service Representatives, on the other hand, have job duties and work environments totally distinct from Service Representatives, who spend nearly all their working hours on the road.  Customer Service Representatives answer calls from patients and referral sources, process orders, verify insurance information, help schedule deliveries and dispatch drivers, perform clerical and filing tasks, and prepare internal reports.  Exhibit 1 ¶ 19; Exhibit 3 ¶ 8; Exhibit 4 ¶ 7; Exhibit 7 ¶ 10; Exhibit 8 ¶ 8; Exhibit 9 ¶ 8; Exhibit 10 ¶ 7; Exhibit 12 ¶ 3.

### 3. *Health Care Specialists*

In contrast to Service Representatives and Customer Service Representatives, Health Care Specialists are licensed clinicians who are generally responsible for the clinical care of patients. Their duties include setup of CPAP and BiPAP machines, setup of ventilation equipment, fitting masks, and related services.  Although Health Care Specialists spend more time in the office than Service Representatives, their job duties take them outside of the office more than half the day, requiring them to exercise individual autonomy when it comes to deciding when and where to take meal breaks.  Exhibit 1 ¶ 18; Exhibit 3 ¶ 12; Exhibit 4 ¶ 10; Exhibit 7 ¶ 9; Exhibit 8 ¶ 12; Exhibit 9 ¶ 11; Exhibit 10 ¶ 10.

### 4. *Regional Billing & Collections Office Employees*

Unlike employees who work in service centers, the employees who work in Regional

Billing & Collections Offices work exclusively handling the Company's billing and collections functions. Thus, during the relevant time period, Regional Billing & Collections Office employees did not work outside the office, did not work with deliveries or patient care, and generally only worked overtime (if at all) at the end of the month.  In fact, the non-exempt employees who work in Regional Billing & Collections Offices bear no relation whatsoever to center employees, either in their job duties, work environments, bonus eligibility, or management structure.   Exhibit 1 ¶ 20; Exhibit 5 ¶ 7; Exhibit 6 ¶ 7.

### E. The Proposed Class Members' Methods Of Taking And Tracking Meal Breaks Varied Widely Depending On Their Position, Geographic Location, Staff Size And Experience, And Manager.

The only commonality in terms of policies and practices between the positions is the Company's insistence that its employees were lawfully compensated.  Plaintiff seeks to represent at least 15 different hourly positions, but these employees had very different methods of taking and tracking their meal breaks.  Exhibit 2 ¶¶ 23-27. Among other things, an employee's meal breaks depended on the person's position, travel schedule for a particular day, work volume, local office practices, staff make-up, and manager discretion.  Exhibit 2 ¶¶ 26-27; Exhibit 3 ¶¶ 20-21; Exhibit 4 ¶¶ 20-21; Exhibit 7 ¶ 18-19; Exhibit 8 ¶¶ 20-22; Exhibit 9 ¶¶ 20-21; Exhibit 10 ¶¶ 18-19.  In light of the Company's operational structure, different locations face distinct daily issues. While some centers are located in rural settings (*e.g.*, Hanover and Wyomissing), other locations operate in dense urban markets (*e.g.*, Philadelphia and Pittsburgh) where the frequency of stops and the high volume of customers may impact when or if an employee takes a daily meal break. Exhibit 2 ¶ 26; Exhibit 9 ¶ 21.  Moreover, local Center Managers have substantial discretion to operate their locations according to their own management style.  As a result, Center Managers

manage their centers differently according to the needs of their particular market.  Exhibit 2 ¶ 28; Exhibit 3 ¶ 18; Exhibit 4 ¶ 16; Exhibit 8 ¶ 18; Exhibit 9 ¶ 18; Exhibit 10 ¶ 16.

The manner in which employees track their meal breaks also varies based on the employee's position and daily schedule.  For instance, Service Representatives, who are usually on the road during lunchtime, track each stop they make during the day to make a delivery on Delivery and Fill Logs, noting when they take a meal break, if applicable, and when they fill up the vans with fuel.  Exhibit 2 ¶ 22, Attachment 1; Exhibit 3 ¶ 20; Exhibit 4 ¶ 18; Exhibit 7 ¶ 18; Exhibit 8 ¶ 20; Exhibit 9 ¶ 20; Exhibit 10 ¶ 18; Exhibit 11 ¶ 4.  In contrast to Service Representatives, Customer Service Representatives spend all of their time in the office.  Therefore, they will just clock in and clock out using the timekeeping system on their computers when they take their meal breaks.  Exhibit 2 ¶ 23; Exhibit 2 ¶ 23; Exhibit 3 ¶ 21; Exhibit 4 ¶ 19; Exhibit 7 ¶ 19; Exhibit 8 ¶ 22; Exhibit 9 ¶ 21; Exhibit 10 ¶ 19.  Health Care Specialists, on the other hand, split their time working inside and outside of the office and track their meal breaks differently depending on their daily schedules.  If, for example, Health Care Specialists are out of the office during a meal break, they will record their meal breaks on Health Care Specialist Daily Logs.  If, however, Health Care Specialists are in the office during a meal break, they will clock in and out of the timekeeping system.  Exhibit 2 ¶ 23; Exhibit 3 ¶ 21; Exhibit 4 ¶ 19; Exhibit 7 ¶ 19; Exhibit 8 ¶ 22; Exhibit 9 ¶ 21; Exhibit 10 ¶ 19.[5]

The manner in which the Company's meal break policy is enforced also varies from location to location.  For instance, at the Bethlehem center, Center Manager Karen Hrivnak

---

[5] If Service Representatives, Customer Service Representatives, or Health Care Specialists needed to have their time adjusted, such as noting that they arrived at work early, worked through a meal break, or worked late, they would notify their Center Manager of the need to adjust their time accordingly.  Typically, this was accomplished by providing the Center Manager with a Time Change Request Form reflecting the necessary change.  Exhibit 1 ¶ 35; Exhibit 2 ¶ 25.  If there was any disparity in the amount of time that an employee reported as hours worked, the Company paid the additional amount.  *Id.*

informs her employees that Lincare's meal break policy requires a thirty minute uninterrupted meal break per day.  Exhibit 3 ¶ 18.  Sometimes, however, she receives Time Change Request Forms from employees indicating that no meal break was taken.  Exhibit 3 ¶ 19.  In those instances when employees work through lunch, which she describes as "rare," Ms. Hrivnak makes sure the employees are paid for meal breaks they worked through, but if she receives those forms too frequently, she will counsel the employees about compliance with the Company's policy.  Exhibit 3 ¶ 18.

Center Manager David Wherry at the Sharon Center manages his center differently.  At the Sharon center, non-exempt employees have more flexibility to decide when or if to take a meal break.  Exhibit 4 ¶ 16.  While Mr. Wherry informs non-exempt employees under his supervision that it is the Company's policy that they take a daily thirty minute meal break, he lets them decide whether or not to take a meal break depending on how busy they are on a given day.  Exhibit 4 ¶ 16.  If a non-exempt employee works through a meal break, however, Mr. Wherry makes sure the employee is paid for that time and does not deduct any time from the employee's working hours.  Exhibit 4 ¶ 16.

Even at centers that are under the supervision of the same Area Manager, employee workloads vary widely depending on the center's location, the number of patients serviced, the size and needs of the areas serviced, and the overall quality and performance of the center's staff.  Exhibit 2 ¶ 27.  For example, the Wyomissing Center where Plaintiff worked does not handle anywhere near the same volume of work as the Lancaster Center.  The Wyomissing Center, which has only two Service Representatives, one Customer Service Representative, and one Health Care Specialist, handles approximately 10 or fewer oxygen set ups per month.  The Lancaster Center, on the other hand, is three times as busy.  Lancaster employs three Service Representatives, three

Customer Service Representatives, and two Health Care Specialists, with a much greater volume of oxygen set-ups – approximately 40 to 60 oxygen set-ups per month. As a general rule, centers with heavier work volumes and smaller or less-experienced staff members are more likely to have hourly employees who elect to work through a meal break or work overtime. Exhibit 2 ¶ 27; Exhibit 10 ¶ 6.

Another key difference between the various non-exempt, hourly positions at the Company is whether a particular employee works on-call. During the relevant time period, depending on the center, the number of staff members, and the volume of work at any given time, some Service Representatives and Health Care Specialists were responsible for handling patient service calls after business hours. Exhibit 1 ¶¶ 21-23; Exhibit 2 ¶¶ 12-14; Exhibit 3 ¶ 13; Exhibit 4 ¶ 11; Exhibit 7 ¶ 11; Exhibit 8 ¶ 13; Exhibit 9 ¶ 12; Exhibit 10 ¶ 11. This included times when the centers were closed, such as weekdays from 5:00 p.m. until 8:00 a.m., as well as on weekends and holidays. Exhibit 1 ¶ 21; Exhibit 3 ¶ 13; Exhibit 4 ¶ 11; Exhibit 7 ¶ 11; Exhibit 8 ¶ 13; Exhibit 9 ¶ 12; Exhibit 10 ¶ 11. For the most part, Customer Service Representatives did not work on-call, whereas Service Representatives frequently worked on-call, and Health Care Specialists also worked on-call, but only to perform those tasks that had to be performed by a licensed clinician. Exhibit 1 ¶ 22; Exhibit 2 ¶ 13; Exhibit 3 ¶ 13; Exhibit 4 ¶ 11; Exhibit 7 ¶ 14; Exhibit 8 ¶ 13; Exhibit 9 ¶ 12; Exhibit 10 ¶ 1; See Exhibit 12 ¶ 3. At some centers, however, Customer Service Representatives had a dual role working as both a Customer Service Representative and a Service Representative after hours. Exhibit 1 ¶ 22; Exhibit 2 ¶ 13; Exhibit 3 ¶ 13; Exhibit 4 ¶ 11; Exhibit 7 ¶ 12; Exhibit 10 ¶ 11. There was no continuity or conformity from one center to another when it came to whether the center exclusively employed traditional Service Representatives, Customer Service Representatives, and Health Care Specialists, or whether the center employed Customer Service

13

Representatives who sometimes worked on-call, or whether the center employed some combination of traditional and dual-role employees based on the staffing needs or work volume at that particular center at a particular time.  Exhibit 1 ¶¶ 22-23; Exhibit 2 ¶¶ 13-14; Exhibit 3 ¶ 13; Exhibit 4 ¶ 11; Exhibit 7 ¶ 13; Exhibit 10 ¶ 11.  Notably, non-exempt employees who worked in Regional Billing & Collections Offices did not work on-call at all.  Exhibit 1 ¶ 20; Exhibit 5 ¶ 7; Exhibit 6 ¶ 7.

> **F.     The Proposed Class Members Either Were Not Eligible For, Or Did Not Receive, The Same Bonuses As Plaintiff.**

During the relevant time period, some employees who worked at centers were eligible to earn a discretionary, quarterly bonus.  Exhibit 1 ¶ 40.  If the Company determines in its discretion to offer a discretionary bonus, the bonus is first calculated and offered to the center if the center meets certain thresholds for a particular quarter.  The bonus is awarded to the center as a whole, not to any one employee specifically.  Following receipt of the bonus award, the Regional Vice President distributes the bonus as he or she sees fit.  Certain employees are not eligible to receive any allocation of the center bonus, including those employees on a performance improvement plan, those not employed for the entire calendar quarter, and those not employed at the time the bonus payment was made.  The Regional Vice President and management, including the Area Manager and Center Manager, have absolute discretion to change not only the amounts to allocate to each employee, but to eliminate an employee's eligibility for a bonus altogether.  This discretion permits the management over each respective center to elect not to allocate any portion of the center bonus to an employee who was otherwise eligible for the bonus.  Exhibit 1 ¶¶ 41-44; Exhibit 3 ¶ 30; Exhibit 4 ¶ 28; Exhibit 10 ¶ 28.

At one point, another type of bonus that had been available to some but not all non-exempt, hourly employees within the relevant time period was a bonus called the Unit Dose bonus.  The

14

Unit Dose bonus allowed eligible employees to earn $15.00 when a patient's doctor referred the patient to obtain Unit Dose medication from the Company.  Exhibit 1 ¶ 45.  Whether and to what extent a non-exempt employee earned a Unit Dose bonus during the relevant time period varied from employee to employee, even within the same center.  For example, Plaintiff received a Unit Dose bonus on approximately nine occasions during the relevant time period, whereas other non-exempt employees did not receive any.  Exhibit 1 ¶ 45; Exhibit 7 ¶ 34.   Many centers do not participate in the Unit Dose bonus program, and their Center Managers are not even aware of such a bonus program being used at the Company.  Exhibit 4 ¶ 30; Exhibit 8 ¶ 28; Exhibit 9 ¶ 27.   Also, none of the Upfront Review Clerks and Patient Account Coordinators who worked in Regional Billing & Collections Offices were eligible to receive a Unit Dose bonus.  Exhibit 1 ¶ 4; Exhibit 5 ¶ 12; Exhibit 6 ¶ 12.

## STATEMENT OF THE QUESTIONS INVOLVED

Question 1:  Whether the Court should deny conditional certification because the Plaintiff does not have standing to represent potential class members who were hired after August 2012 and signed stand-alone class and collective action waivers, and all the potential class members, including Plaintiff, acknowledged receipt of the Company's collective and class action waiver in the Employee Handbook and agreed to be bound by it, and collective treatment of this action would mire the Court in individualized inquiries determining whether each opt-in plaintiff waived his or her right to bring a collective action as a condition of employment and, consequently, cannot join this action or participate in any future recovery stemming from this action.

Question 2:  Whether, under Section 216(b) of the Fair Labor Standards Act, Plaintiff has made the required factual showing that he is similarly situated to the proposed class members with regard to his meal break and bonus rate claims, where the proposed class consists of all non-

exempt, hourly employees in Pennsylvania who worked in at least 15 different positions with distinct job duties, meal break practices, and bonus eligibility; and who worked in at least 22 different locations under different managers.

## SUMMARY OF ARGUMENT

This Court should deny Plaintiff's Motion for Conditional Certification because, even if Plaintiff could satisfy his burden of making the required factual showing that he and a portion of his proposed class members are similarly situated, this matter is plainly unsuitable for collective treatment. All of the proposed class members who were hired after August 2012 executed stand-alone class and collective action waivers which prevent them from participating in this case. Likewise, since July 2013, all employees, including Plaintiff, have been required to acknowledge receipt of the class and collective action waiver contained in the Company's Employee Handbook and have agreed to be bound by its terms. Therefore, if this matter proceeds as a collective action, it would ultimately turn into a fiasco of mini-trials marred by unrelated claims and defenses.

Moreover, conditional certification is not warranted because there is no common proof of "off-the-clock" meal break violations among Plaintiff and his proposed class members. Plaintiff seeks to represent all hourly employees who worked for the Company in Pennsylvania, but each of the proposed class members' claims hinges upon individualized factual circumstances, such as: (i) which of the at least 15 non-exempt positions is at issue, (ii) the proposed class members' management structure; (iii) the discretion exercised by local Center Managers and their strict or lenient adherence to the mandatory meal break policy; (iv) which of the Company's 22 geographical locations employed each proposed class member; (v) the volume of work at a particular center at a particular time; and (vi) the size, experience, and make-up of a particular center's staff, among other factors.

16

Similarly, Plaintiff's claim that his bonus compensation should have been taken into account when calculating his overtime rate is hopelessly diverse and unsuitable for collective treatment because whether a particular non-exempt employee was eligible to receive a bonus, or did receive a bonus, varied from location to location and employee to employee. There were various bonus plans during the relevant time period, and not all non-exempt employees were subject to the same bonus plans as Plaintiff. Also, some of the bonuses paid to non-exempt employees were discretionary, profit-sharing bonuses, which did not have to be factored into the overtime rate.

Lastly, as of the date this opposition brief was filed, no proposed class members have consented to join this action or submitted declarations demonstrating that their experiences with regard to meal breaks and bonuses have any similarity to Plaintiff's. As a result, the Court should deny Plaintiff's Motion in its entirety.

## **ARGUMENT**

I.     **The Standard for Conditional Certification In The Third Circuit Requires Plaintiff To Make A Modest Factual Showing, Beyond Pure Speculation, That He Is Similarly Situated To His Proposed Class Members.**

To warrant conditional certification, Plaintiff must "make a modest factual showing" that he is "similarly situated" to the proposed collective action members. *Camesi v. University of Pittsburgh Med. Ctr.*, 729 F.3d 239, 243 (3d Cir. 2013). This standard, though "fairly lenient," is not automatic or non-existent, and district courts should not function as a rubber stamp for any claims that come their way. *See Bramble v. Wal-Mart Stores, Inc.*, No. 09-4932, 2011 WL 1389510, at *4 (E.D. Pa. Apr. 12, 2011); *see also Burkhart–Deal v. Citifinancial, Inc.*, No. 07–1747, 2010 WL 457127, at *5 (W.D. Pa., Feb. 4, 2010). District courts in the Third Circuit have routinely denied requests for conditional certification where the plaintiff attempts to certify a broad

class based only on the conclusory allegations of just a few employees.  *See Bramble*, 2011 WL 1389510, at *5 n.6 (denying conditional certification and noting that plaintiffs primarily relied on their own declarations and depositions in arguing that all putative class members were similarly situated, whereas defendant presented contrary declarations of employees in the putative class that had not consented to sue); *White v. Rick Bus Co.*, 743 F. Supp. 2d 380, 389 (D.N.J. 2010) (denying plaintiff's motion for conditional certification based on generic, conclusory statements alleging that there were other similarly situated employees).

In S*mith v. Sovereign Bancorp*, No. Civ. A. 03-2420, 2003 WL 22701017, *2 (E.D. Pa. Nov. 13, 2003), a district court here in the Eastern District of Pennsylvania  criticized those courts that have permitted conditional certification based solely on a plaintiff's unsubstantiated allegations in support of the "similarly situated" requirement:

> Under this rationale, any plaintiff who is denied overtime pay may file suit under [the] FLSA and, as long as her complaint is well-pled, receive preliminary class certification and send court-approved notice forms to every one of her employer's hourly employees. This is, at best, an inefficient and overbroad application of the opt-in system, and at worst it places a substantial and expensive burden on a defendant to provide names and addresses . . .  of employees who would clearly be established as outside the class if the plaintiff were to conduct even minimal class-related discovery. More importantly, automatic preliminary class certification is at odds with the Supreme Court's recommendation to ascertain the contours of the [Section 216] action at the outset.

*Id.* at *2 (internal quotations omitted).  The court further recognized that conditionally certifying a collective action based merely on conclusory allegations does not comport with the congressional intent behind the FLSA's opt-in requirement, which was designed to limit potentially unmanageable collective actions.  *See id.*  Therefore, it is essential for courts to ensure that plaintiffs meet their burden of demonstrating a factual foundation for their claims "to allow the court to manage the potential for abuse often inherent to class action suits." *See Duffy v. Sodexho*,

No. 05-5428, 2006 WL 3025958, *3 (E.D. Pa. Oct. 20, 2006).  As shown below, Plaintiff has not made a modest factual showing that he is similarly situated to his proposed class members and, even if he could make such a showing, his claims are not suitable for collective treatment.  This Court should deny Plaintiff's Motion accordingly.

**II.**     **As A Threshold Matter, Many, If Not All, Of The Proposed Class Members Are Barred From Participating In This Action Because They Waived The Right To Bring A Class Action Or Collective Action Against The Company As A Condition Of Their Employment.**

Importantly, even if the Court determines that conditional certification is appropriate, many, if not all, of the potential class members are excluded from this case because they agreed, as a condition of their employment, "to waive any right . . . to be a lead and/or member of a Class or Collective action lawsuit or a representative of a Class or Collective action lawsuit against Lincare or any of its subsidiaries or related entities."  *See* Exhibit 1 ¶ 47, Attachments 9-10.   Of course, determining the viability of the waivers for each potential class member would require its own individualized analysis that would render collective treatment unmanageable.  *See Adami v. Cardo Windows, Inc.*, 299 F.R.D. 68, 81-82 (D.N.J. 2014) (excluding from collective action employees who signed waiver agreements).

The Court's difficulty in managing the claims of Plaintiff's proposed class would be further exacerbated by the fact that some of the potential opt-ins signed stand-alone waivers, while others (including Plaintiff) signed acknowledgment forms agreeing to be bound by the waiver set forth in the Employee Handbook, which would raise different factual issues about the waivers' validity and enforceability.  In fact, Plaintiff, who was employed before August 2012 and therefore did not sign a stand-alone waiver, does not even have standing to contest the validity of the stand-alone waiver signed by the proposed class members hired after August 2012.  Clearly, authorizing the

formation of a collective action under these facts would be unjustified and would hinder judicial

economy, the purpose of Section 216(b), and the efficient administration of justice.

**III.**   **Conditional Certification Is Inappropriate Because Plaintiff Has Not Demonstrated That He Is Similarly Situated To The Potential Class Members.**

   **A.**   **Plaintiff And His Proposed Class Members Are Not Similarly Situated, And Their Claims Are Not Susceptible To Common Proof.**

The very nature of off-the-clock meal break claims and the divergent evidence required to

prove them, renders this collective action unsustainable.   Plaintiff conveniently ignores the

essential differences among Service Representatives themselves, much less the at least 14 other

non-exempt positions he seeks to join as class members.   The employees' meal break practices

vary widely based on the position, the Center Managers' discretion, work environments,

geography, work volume, and other factors creating   unique factual circumstances precluding

common proof and inviting, instead, hundreds of mini-trials.   The details of each individual's meal

break claim would necessarily have to be sorted out for each potential class member before the

Court could realistically turn to liability.   Further, because each potential class member had the

opportunity to adjust and correct his or her timesheets, the Court would need to resolve whether

each class member modified his or her time to reflect actual time worked, and, if not, *why* the class

member chose to underreport the hours and verify their accuracy.   *See Joza v. WW JFK LLC*, No.

07-CV-4153 (ENV) (JO), 2010 WL 3619551, *7 (E.D.N.Y. Sep. 10, 2010) (rejecting employee's

wage claims because he knowingly underreported time worked).

The individual experiences of each potential class member demonstrate that any

implementation of the Company's policies leading to purported liability was not systemic, let alone

tied to any official policy; rather, it was based on varied circumstances at each center on any given

day, such as workloads, employee choices and preferences, the position involved, manager

discretion, the number of patients, the size and experience of staff, and the amount and types of equipment and services to be provided on any given day.  Exhibit 1 ¶¶ 17-23; Exhibit 2 ¶¶ 4-14; Exhibit 3 ¶ 18; Exhibit 4 ¶ 16; Exhibit 8 ¶ 18; Exhibit 9 ¶ 18; Exhibit 10 ¶ 16.

Similarly, with regard to Plaintiff's claim that his overtime rate did not take into account his bonus compensation, there was a wide divergence among the potential class members concerning their eligibility for different types of bonuses, whether the bonus was discretionary (which does not have to be factored into the overtime rate), and whether the employees actually received any such bonus during the relevant time period.  For example, some center employees were eligible to receive a discretionary profit sharing bonus, while others were not because of their job performance history or short tenure with the company.  Exhibit 1 ¶¶ 41-47; Exhibit 3 ¶ 29; Exhibit 4 ¶ 27; Exhibit 10 ¶ 27.  Moreover, allocation of a center's profit sharing bonus was within the absolute discretion of the Regional Vice President, the Area Manager, and the Center Manager, who decided not only how much to allocate to a particular employee, but whether to eliminate an employee's eligibility for a bonus altogether.  Exhibit 1 ¶ 44; Exhibit 3 ¶ 30; Exhibit 4 ¶ 28; Exhibit 10 ¶ 28.

Plaintiff's bonus claim appears to be focused on his receipt of a Unit Dose bonus, whereby a center employee could earn $15.00 when a patient's doctor referred the patient to obtain Unit Dose medication from the Company.  Exhibit 3 ¶ 32; Exhibit 7 ¶ 34 Exhibit 10 ¶ 30; Exhibit 12 ¶ 10.  Whether and to what extent a center employee earned a Unit Dose bonus, however, varied from employee to employee, even within the same center.  For example, Plaintiff, who worked at the Wyomissing Center, received a Unit Dose bonus on approximately nine occasions during the relevant time period, whereas other non-exempt employees who worked in centers did not receive any.   Exhibit 1 ¶¶ 46-47.  In fact, at some centers, the Center Manager was not even aware of the

Unit Dose Program, and the employees who worked in Regional Billing & Collections Offices were not eligible to participate in any of the same bonus plans as Plaintiff.  Exhibit 1 ¶¶ 46-47; Exhibit 4 ¶ 30; Exhibit 8 ¶ 28; Exhibit 9 ¶ 27.  Based on these facts, Plaintiff has not come forward with any showing, modest or otherwise, that he is similarly situated to his proposed class members with regard to his bonus claim, or that his bonus claim is susceptible to common proof.

> **B.** **This Court Should Reach the Same Decision As The Middle District of Florida's *Udo* Decision And Find That The Proposed Class Members Are Not Similarly Situated, And That The Nature of Defendants' Business Operations Are Not Suitable For Collective Treatment Of Meal Break Claims.**

In 2014, a district court in the Middle District of Florida denied conditional certification in a case against Lincare based on allegations similar to Plaintiff's.  In *Udo v. Lincare Inc.*, No. 8:13-cv-1899-T-23TGW, 2014 WL 5354589, *10 (M.D. Fla Aug. 6, 2014), the plaintiff sought conditional certification of all Service Representatives nationwide.  Significantly, although the proposed class in *Udo* was geographically broader, the plaintiff was only seeking conditional certification of *one position* – his own.  After analyzing much of the same evidence proffered by Defendants in this case, the *Udo* court found that Service Representatives were not similarly situated *to each other* because they worked at different locations under different Center Managers, who had discretion to manage attendance, scheduling, timekeeping, and job performance.  *Udo*, 2014 WL 5354589 at *10.  The court emphasized that the Center Managers had varied approaches regarding meal periods, there was substantial variation in the way Service Representatives handled their lunch breaks, and Service Representatives' schedules varied based on their particular locations and routes.  *Id.* at *11.  According to the court, "these fundamental differences would require highly individualized inquiries regarding each Service Representative's respective Center Manager; number of worked lunch breaks that were uncompensated, if any; and whether each Service Representative modified his or her time with Time Card Change Logs or some other

method." *Id.*  The court also found it significant that the proposed class members who became employed after 2013 signed a stand-alone waiver of their right to become a member of a collective action, which would require the court to delve into the waiver's validity and enforceability for each affected class member.  *Id.*[6]  As a result, the court denied plaintiff's motion for conditional certification, even though the plaintiff and six of the seven opt-in plaintiffs submitted declarations in support of the motion. *Id.*

Here, all of the same reasons for denying conditional certification in *Udo* are present, but this case is even less suitable for collective treatment.  Unlike the plaintiff in *Udo*, whose proposed class was limited to Service Representatives, Plaintiff's proposed class is comprised of ***all hourly employees*** in Pennsylvania, which represents at least 15 different positions, most of which have no similarity to Service Representatives, who are drivers who make deliveries and spend most of their time (including meal breaks) on the road and track their meal breaks differently than other hourly employees.  Further, Plaintiff's proposed class would include hourly employees who work in Regional Billing & Collections Offices who not only have different job duties and work under different managers, but work under an entirely different management structure that has no reporting relationship or any similarity whatsoever to Center Managers.  Additionally, like the proposed class members in *Udo*, Plaintiff's proposed class members who were hired after August 2012 signed stand-alone class and collective action waivers as a condition of their employment, and, since July 2013, the Company's Employee Handbook has included a class and collective action waiver, to which all employees (including Plaintiff) agree to be bound and acknowledge in writing when they sign the Handbook Acknowledgment Form. This would necessarily impede the efficient resolution of claims -- the very purpose of Section 216(b) -- as the Court would be

---

[6] Notably, since *Udo*, the Company has further upgraded its timekeeping procedures to require employees to re-review and approve their timesheets whenever edits are made.

required to determine the validity and enforceability of the waiver as to each class member.  As a result, even under the Third Circuit's lenient standard, conditional certification is wholly inappropriate in this case, and the Plaintiff's Motion should be denied.

### C.   The Company's Only Common Policies Are Lawful; Consequently, Any Manager's Deviation From The Policies Would Require Individualized Analysis.

As explained above, the only policies the Company enforces and promulgates are: (1) non-exempt employees are responsible for accurately reporting and verifying all hours worked; and (2) non-exempt employees are paid for all hours worked.  As one court has held, "[i]n the absence of any evidence tending to show that the Company routinely breached the FLSA's pay provisions, these deviations are case-specific and subject to variables, making them unfit for a collective action."  *Andersen v. Wells Fargo Financial, Inc.*, No. 4:11-cv-00085, 2012 WL 12871958, *6 (S.D. Iowa Feb. 6, 2012).   The fact that the Company went to such great lengths to establish accurate time records, train its hourly employees and Center Managers on the policies, and remind the Center Managers of the policies' importance, further demonstrates that, far from having a common policy to violate the FLSA, the only common policy was to require that employees and managers ensured, every step of the way, that employees were paid for all the time they worked.[7] *See* Exhibit 1 ¶¶ 27-28; *see also* Exhibit 1 ¶ 28, Attachment 4 (where Midwest Region Manager Dave Morrison advised Center Managers, in an e-mail dated February 4, 2015, that "The RULE is crystal clear!  If [non-exempt employees] worked the time it needs to be paid period" and further

---

[7] Even if, for argument's sake, Plaintiff's Center Managers misunderstood or ignored the Company's policies and chose to give instructions in direct contravention of the Company's explicit directive to pay employees for all hours worked, that would be insufficient to justify a statewide collective action.  *See, e.g., Andersen v. Wells Fargo Fin., Inc.*, No. 4:11-cv-00085, 2012 WL 12871958, at *6 (S.D. Iowa Feb. 6, 2012).

warned Center Managers that failure to pay employees for all time worked "CAN get the [Center Manager] fired") (emphasis in original).

**D.     Plaintiffs' Declarations Are Too Vague And Speculative To Support Conditional Certification.**

Plaintiff has petitioned this Court to authorize notice to a statewide class of more than 400 current and former hourly employees at 22 locations across Pennsylvania.   In support of his sweeping request, Plaintiff has submitted two threadbare declarations which fail to identify any specific individuals who were affected by the same alleged wrongful policies as Plaintiff.  On their face, the cursory allegations of Plaintiff and his former Wyomissing Center Manager Justin Schenk[8]  ("Schenk"), are woefully insufficient to support statewide conditional certification.  For example, Plaintiff claims Schenk told him that an unnamed manager in Lancaster (and no other center) also deducted thirty minutes from his unidentified employees, regardless of whether they took lunch breaks.  Pl.'s Decl. ¶ 7 (Doc. 19-3).  Plaintiff also claims that he allegedly performed deliveries for the York, Hanover, and Harrisburg centers within his service area (not any other centers or service areas), and hourly employees (unspecified by name or position) allegedly complained about meal break deductions.  *Id.*   Schenk's declaration is similarly devoid of detail. He alleges that he only managed five hourly employees at the Wyomissing Center, but he kept in "close contact" with the four other centers in his area (not the Company's other 18 locations in Pennsylvania) and "conferred" with unnamed employees, thus making him "familiar with the job duties and working conditions of all hourly employees" outside of the Wyomissing Center.  Schenk Decl. ¶ 10 (Doc. 19-4).

---

[8] Justin Schenk, a disgruntled former employee, was terminated for insubordination when he refused to terminate Plaintiff's employment for unsafe driving.  *See* Exhibit 2 ¶ 16.

25

Plaintiff's declarations fail to reach the requisite "modest factual showing" needed for conditional certification because they are rife with unsubstantiated speculation.  *See Williams v. Securitas Sec. Servs. USA, Inc.*, No. 10–7181, 2011 WL 4544009, at *1 (E.D. Pa. 2011) ("threadbare declarations" do not supply the requisite "modest factual showing"); *Wright v. Lehigh Valley Hosp.*, No. 10-431, 2010 WL 3363992, at *4 (E.D. Pa. 2010) (conclusory allegations in a declaration are insufficient for conditional certification); *Kronick v. Bebe Stores, Inc.*, No. 07-4514 (RBK), 2008 WL 4546368, at *3 (D.N.J. 2008) (denying conditional certification because affidavits were "so bereft of detail that they hardly address the critical issues required"); *Armstrong v. Weichert Realtors*, No. 05-3120 (JAG), 2006 WL 1455781, at *1 (D.N.J. 2006) (vague, general statements are insufficient to conditionally certify collective action).

In contrast to Plaintiff's paltry factual showing, Defendants' 12 declarations include declarations from a District Manager, six Center Managers from a cross-sampling of centers across Pennsylvania; two Regional Billing & Collections Office Managers; and several current or former hourly employees within the proposed class who have attested that they were not: (a) subjected to any automatic meal break deductions; (b) owed any overtime compensation because of working through meal breaks; (c) forced or coerced into signing declarations; (d) owed any unpaid wages; (e) interested in joining this action; or (f) aware of any others who desire to join this action.[9]  Even

---

[9] Plaintiff's attempt to bring this action on behalf of all hourly employees in Pennsylvania (based on two declarations from employees who worked in a single location) is brazen overreach, as Plaintiff's evidence does not support his assertion of widespread violations resulting from a common policy or plan.  *See Wright v. Lehigh Valley Hosp.*, CIV.A 10-431, 2010 WL 3363992, at *4 (E.D. Pa. Aug. 24, 2010) (denying conditional certification because plaintiff was unable to name a second person subjected to the alleged FLSA violations); *see also Thompson v. Speedway SuperAmerica, LLC*, No. 08-cv-1107(PJS/RJE), 2009 WL 130069, at *13 (D. Minn. Jan. 20, 2008) (denying conditional certification where less than one percent of proposed class submitted declarations and finding that, although plaintiffs offered evidence that a tiny fraction of the putative class may not have received some compensation under the FLSA, under defendant's own published policies, the plaintiffs did not establish their claim that defendant implemented a corporate decision to ignore its published policies).

at the first stage of the certification process, the gross disparity between the evidence submitted by the Defendants and the Plaintiff's speculative and cursory allegations is too glaring to ignore.

Plaintiff has failed to proffer evidence from which this Court could infer that other proposed class members endured deprivations similar to those Plaintiff allegedly experienced. Although he makes repeated references to alleged similarly situated employees, he fails to name a single employee, other than himself.   Plaintiff's argument that the Company must have violated other hourly employees' rights because his particular Center Manager allegedly engaged in rogue practices in violation of the Company's uniform, lawful policies is insufficient to satisfy the modest factual showing test.  Although Plaintiff may arguably have set forth evidence that he has an individual claim under the FLSA, his unsupported assertion that all other hourly employees in Pennsylvania must have been subjected to the same conditions is insufficient to sustain his minimal burden.  As a result, this Court should find that Plaintiff has failed to make a modest factual showing supporting conditional certification and deny Plaintiff's Motion accordingly.

**IV.**     **At A Minimum, If The Court Grants Conditional Certification, The Proposed Meal Break Class Should Be Limited To Plaintiff's Position And Geographical Location, And The Proposed Bonus Class Should Be Limited To Those Who Received The Unit Dose Bonus During The Relevant Time Period.  Also, Notice Should Be Disseminated Only By U.S. Mail And Revised To Inform Opt-Ins Of The Consequences Of Joining This Lawsuit.**

Although Defendants strenuously argue that conditional certification is not warranted, at the very least, if the Court determines that notice to any potential class members is appropriate, the Court should limit the proposed meal break class to those employees who worked in the same position and same location as Plaintiff during the relevant time period (*i.e.*, Service Representatives who worked at the Wyomissing Center).  *See Ruehl v. Viacom, Inc.*, 500 F.3d 375, 389 (3d Cir. 2007) ("whether the plaintiffs are employed in the same corporate department, division and location" are factors in the similarly situated analysis); *Holley v. Erickson Living*, No.

11-2444, 2012 WL 1835738, at *4 (E.D. Pa. 2012) (limiting claim to location where plaintiff worked because plaintiff provided no documentary or other evidence that the policy allegedly in effect at his work location affected employees at other locations).

Likewise, the Court should limit the proposed bonus class to those employees who worked as Service Representatives at the Wyomissing Center <u>and</u> actually received the same Unit Dose bonus as Plaintiff within the relevant time period.  This would at least preclude notice being sent to employees who did not participate in the same bonus programs as Plaintiff, or were not eligible to receive bonuses for other reasons.  *See Fulton v. Bayou Well Services LLC*, 208 F. Supp. 3d 798, 803 (N.D. Tex. 2016) (limiting proposed class to those who received same non-discretionary bonus as plaintiff).

In addition, the language of the proposed notice should be modified.  Plaintiff has requested that the Court require Defendants to provide cell phone numbers and e-mail addresses of the potential class members.  Many courts have rejected such requests.  *See, e.g.,   Hinterberger v. Catholic Health Sys.*, No. 08–CV–380S, 2009 WL 3464134, *11 (W.D.N.Y. Oct. 21, 2009) (absent some unusual circumstances, typical method utilized to disseminate notice is first-class mail); *see also Blakes v. Ill. Bell Tel. Co.*, No. 11CV336, 2011 WL 2446598, at *6-7 (N.D. Ill. June 15, 2011) (providing class members' telephone numbers "carries privacy concerns and that information is not crucial to providing notification").  This Court should make the same findings here and limit the dissemination of notice to U.S. Mail.

This Court should also require Plaintiff to revise the proposed notice to inform potential class members of the possible consequences of joining this lawsuit.  Specifically, the notice fails to inform potential opt-in plaintiffs that they may be responsible for Defendants' attorneys' fees and costs in this matter.  While some courts have declined to require the inclusion of such language

in a collective action notice because the likelihood of the defendant being awarded fees against an opt-in plaintiff was slight, that certainly is not the case here because most if not all of the proposed class members agreed to be bound by collective action waivers which prevent them from joining a collective action lawsuit. Therefore, the notice should be revised so that potential opt-in plaintiffs can make an informed decision about whether to participate in this case. *See Wright v. Lehigh Valley Hosp. & Health Network*, No. 10-431, 2011 WL 221770, at *7 (E.D. Pa. Jan. 20, 2011) (approving addition of information about court costs in notice and noting that "[c]ourts have awarded costs to prevailing defendants in FLSA cases and have required named plaintiffs to include information about such possibility in notice sent to potential opt-ins); *see also White v. Subcontracting Concepts, Inc.*, No. 8:08-cv-620-T-30TGW, 2008 WL 4925629, *2 (M.D. Fla. Nov. 14, 2008) (approving proposed notice except to extent it failed to warn potential class members of consequences of opting-in, including liability for indemnification, attorney's fees and costs"); *Gjurovich v. Emmanuel's Marketplace, Inc.*, 282 F. Supp. 2d 91, 98 (S.D.N.Y. 2003) (approving notice that included language informing potential opt-in plaintiffs that they "may also be held liable for costs associated with this lawsuit, and for potential counterclaims which could be asserted against you").

## CONCLUSION

Many of the at least 412 proposed class members are prevented from joining this lawsuit because they executed stand-alone class and collective action waivers as a condition of their employment.  In addition, all employees since July 2013, including Plaintiff, have agreed to be bound by the class and collective action waiver set forth in the Company's Employee Handbook and acknowledged their agreement in writing, making this action unsuitable for collective treatment. Further, contrary to Plaintiff's cursory allegations and conjecture, he is not similarly

situated with the hundreds of non-exempt, hourly employees who worked in at least 15 different positions in 22 different locations in Pennsylvania, and his claims are not susceptible to common proof or collective treatment.  Therefore, this Court should deny Plaintiff's Motion in its entirety.

WHEREFORE, Defendants respectfully ask this Court to enter an Order denying Plaintiff's Motion.  A copy of Defendants' proposed Order is attached hereto as Exhibit A for the Court's consideration.

**[Signatures Appear On Next Page]**

Dated:  April 28, 2017          Respectfully submitted,

**FORD HARRISON LLP**

By:     */s/ Mark A. Saloman*
          Mark A. Saloman (Bar ID 71195)
          300 Connell Drive, Suite 4100
          Berkeley Heights, New Jersey 07922
          Telephone:  (973) 646-7300
          Facsimile:  (973) 646-7301
          msaloman@fordharrison.com

          Todd S. Aidman (Pro Hac Vice)
          Florida Bar No. 173029
          taidman@fordharrison.com
          Ashwin R. Trehan (Pro Hac Vice)
          Florida Bar No. 0042675
          atrehan@fordharrison.com

          **FordHarrison LLP**
          101 E. Kennedy Boulevard, Suite 900
          Tampa, Florida 33602-5133
          Telephone:  (813) 261-7800
          Facsimile:  (813) 261-7899

          *Attorneys for Defendants Health Care*
          *Solutions at Home Inc. and Lincare Inc.*

## CERTIFICATION REGARDING FILING AND SERVICE

The undersigned hereby certifies that a copy of this pleading was filed and served within the time permitted by the court rules.  The undersigned further certifies that on April 28, 2017, the foregoing pleading was served upon all parties via ECF electronic filing.

Dated: April 28, 2017                              Respectfully submitted,

FORD HARRISON LLP
300 Connell Drive, Suite 4100
Berkeley Heights, New Jersey 07922
Phone: (973) 646-7300
Fax: (973) 646-7301


By: *Mark A. Saloman*
    Mark A. Saloman  (Bar ID. 71195)

*Attorneys for Defendants Health Care Solutions at Home Inc. and Lincare Inc.*

WSACTIVELLP:9132859.1

# EXHIBIT A

**UNITED STATES DISTRICT COURT FOR**
**THE EASTERN DISTRICT OF PENNSYLVANIA**
**PHILADELPHIA DIVISION**

| | |
|---|---|
| JEFFREY SAWYER, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Civil Action No. 5:16-cv-05674-JFL |
| v. | |
| HEALTH CARE SOLUTIONS AT HOME INC. and LINCARE INC., | |
| Defendants. | |

## <u>ORDER</u>

Upon consideration of Plaintiff's Pre-Discovery Motion for Conditional Certification and Court-Supervised Notice and Defendant's Response in Opposition thereto, and for good cause shown, it is this _____ day of _____, 2017, hereby ORDERED that:

1.    Plaintiff's Pre-Discovery Motion for Conditional Certification and Court-Supervised Notice Pursuant to 29 U.S.C. § 216(b) is DENIED.

_____
The Honorable Joseph F. Leeson, Jr.
United States District Judge